## THE STATE v. CRAB, *Appellant.*

Division Two, May 8, 1894.

1. **Criminal Law:** CONSPIRACY: EVIDENCE. Letters written in furtherance of a conspiracy for the forgery of a deed by a party thereto are competent evidence against one who joined the conspirators after the writing of the letters.

2. ———: EVIDENCE, OBJECTION TO. Complaint can not be made of the admission of evidence, where no objection was made thereto at the time.

3. ‘———: COMPETENCY OF WITNESS: WAIVER OF OBJECTION. Objection to a witness because incompetent to testify, must be made when he is introduced. It comes too late in the motion for a new trial.

4. **Criminal Practice:** DISMISSAL OF INDICTMENT: PRESUMPTION. It will not be presumed on appeal that the indictment, as to one jointly indicted with the defendant, and who testified against the latter, was dismissed after defendant's trial was begun, where the record merely shows it was dismissed on the same day.

5. **Criminal Law:** FORGERY: PRINCIPAL. One who is present at the forgery of a deed, knowingly aiding, abetting or assisting such forgery, is guilty as a principal, although the act of signing the name with intent to forge the same was done by another person.

6. **Criminal Practice:** EVIDENCE OF ACCOMPLICE: INSTRUCTION. An instruction that the evidence of an accomplice is admissible, yet when not corroborated by some person not implicated in the crime as to matters connecting the defendant with its commission, it ought to be received by the jury with great caution, and they ought to be fully satisfied of its truth before convicting defendant on such testimony, but they are at liberty to convict the defendant on the uncorroborated testimony of an accomplice, if they believe his statements to be true and that the facts sworn to by him establish defendant's guilt, fairly presents the law to the jury.

*Appeal from Jackson Criminal Court.*—Hon. John W. Wofford, Judge.

Affirmed.

*Arthur S. Lyman* for appellant.

(1) The court erred in permitting the. Whalen letters to be received and read in evidence over the objection of the defendant. 3 Greenleaf on Evidence [13. Ed.], sec. 92; 1 *Ibid.*, sec. 111; *State v. Daubert*, 42 Mo. 239; *State v. Walker*, 98 Mo. 95; *State v. Melrose*, 98. Mo. 594; *Bedford v. State*, 55 N. W. Rep. 263. (2) The evidence of Mr. Lesueur and the witnesses Seidlitz. and Vincil, after comparison of handwriting in the. Whalen letters with a letter not introduced in evidence and not in this case, and which is not admitted by any party to the record, but said to have been written by George W. Dawson, is error. *State v. Minton*, 22 S. W. Rep. 808; *State v. Scott*, 45 Mo. 302; *State v. Tompkins*, 71 Mo. 614; 1 Greenleaf on Evidence [13 Ed.], sec. 581; *State v. Clinton*, 67 Mo. 380; *Rose v. Bank*, 91 Mo. 399. (3) The court erred in permitting the witness Cottrell, who was jointly indicted with defendant, to testify in the case on October 30, 1893. *First.* Cottrell was not a competent witness until the *nolle prosequi* was entered and an order made discharging him, of which he had knowledge. R. S. 1889, sec. 4217; *State v. Chyo Chiagk*, 92 Mo. 395, and cases there cited. *Second.* It is not the mere fact of his discharge or conviction which makes a jointly indicted accomplice a. competent witness; it is his knowledge of the fact. Any other construction of the statute would be absurd and would be against the reason of the rule. *State v. Chyo Chiagk, supra.* (4) Instruction number 8 given on behalf of the state is misleading, and should not have been given over defendant's objection.

*R. F. Walker*, Attorney General, and *Marcy K. Brown*, Prosecuting Attorney, for the state.

(1) The indictment is sufficient, being a literal copy of the form approved by this court in *State v. Fisher*, 65 Mo. 437; 4 Park. Cr. R. 217; *State v. Stewart*, 90 Mo. 511.   (2) The court properly permitted the Whalen letters to be read in evidence; they were the very basis of the conspiracy leading up to and furnishing a motive for the forgery; they showed defendant's participation in the forgery and the intended fruits of it; they were necessary to explain the subsequent letters of appellant Crab to Lesueur upon the same subjects.   (3) For the purpose of showing the existence and purpose of the conspiracy to commit the forgery, the Whalen letters were clearly admissible.   *State v. Walker*, 98 Mo. 95; 2 Bish. Cr. Proc. [3 Ed.], sec. 227; *State v. Flanders*, 118 Mo. 227; *Goetz v. Flanders*, 118 Mo. 342.   (4) The evidence of Cottrell, Vincil, Seidlitz and Lesueur as to comparisons of handwriting of different letters written by Dawson, for the purpose of showing that Dawson was none other than Whalen, and had written tne Whalen letters negotiating the loan, was competent.   (5) The evidence of Cottrell, who was jointly indicted with appellant, was perfectly competent and properly admissible; the court had directed that Cottrell be discharged in order that he might be a witness for the state; this was done, not only before appellant had gone into his defense, but before the trial of defendant had begun.   R. S. 1889, sec. 4217.   (6) Instruction number 8 given for the state is a proper one, instructing the jury that, if another person than appellant signed Bishop's name with the intent of forging said name to the deed, and that appellant was present knowingly, etc., aiding, etc., in the doing of such act, then they must treat such act

as one done and performed by appellant himself. This is a familiar rule requiring no citations to support such a well settled principle. (7) Instruction number 9 given in behalf of the state, concerning which appellant complains, is a proper one and correctly declares the law concerning the testimony of an accomplice; this instruction was literally copied from instructions approved by this court in *State v. Harkins*, 100 Mo. 672; *State v. Jackson*, 106 Mo. 179.

BURGESS, J.—Defendant was jointly indicted in the criminal court of Jackson county with George W. Dawson, C. C. Pratt and J. H. Cottrell on September 24, 1893, for forgery in the first degree, by forging the name of one Wayne S. Bishop to a deed transferring a large tract of land in Lafayette county upon which there was a farm, to Jacob H. Crab. A severance was granted defendant and upon a trial had, he was found guilty, and his punishment assessed at ten years imprisonment in the penitentiary. From the judgment and sentence he appeals to this court.

The facts are that on the fifteenth day of May, 1893, George W. Dawson, under the name of John K. Whalen, wrote a letter addressed to the recorder of deeds, Lexington, Missouri, asking him to hand the letter to an abstractor of land titles, in the same letter asking what a complete abstract of title of Bishop's land near Bates City would cost, stating that Bishop would pay for the abstract. This letter was handed by the recorder to J. O. Lesueur, an abstractor. This letter was requested to be answered to John K. Whalen, general delivery, Kansas City, Missouri. From that time on a correspondence was kept up between Lesueur and Whalen, *alias* Dawson, until June 9, 1893, when defendant took up the correspond-

ence and continued it until the arrest of all the parties named in the indictment.

Defendant does not seem to have had any connection with his co-indictees in regard to the land until about June 1, 1893, when Pratt approached him and told him about a party who wanted to trade a farm for some wild land and some money, and undertook to arrange the trade. The farm owned by Bishop was a valuable one, worth about $15,000, unincumbered, containing about three hundred acres, and being in Lafayette county. The scheme between Dawson, Pratt and Crab seems to have been to forge Bishop's name to a deed for his land, and for that purpose have someone to personate him, then obtain a loan upon the land in the name of the grantee for all or as much money as could be obtained, hence the continued correspondence with Lesueur, who was also a loan agent as well as abstractor. Cottrell was selected as the man to personate Bishop.

Dawson, after negotiating with Cottrell, finally induced him to consent to go before a notary and personate Bishop and sign and acknowledge the deed to Crab. Cottrell met Dawson and Pratt as per agreement the day before the forgery was committed, at a bucket-shop near the notary's office, and they arranged the details of the visit to be made to the notary's office on the following day. Dawson's introduction of Cottrell to Pratt was in these words: "This is the man who is going to play the part of Bishop for us;" whereupon Pratt asked Cottrell: "If he was going to help them out in this little deal?"

On the following day Cottrell again met Dawson and Pratt, by agreement, at the bucket-shop, where, in the presence of both Pratt and Dawson, Cottrell was induced to go into a water-closet and change some of his clothing and put on others brought for that purpose

by Dawson, and Cottrell was further disguised by tying a handkerchief over his right eye. Pratt said to Cottrell: "You are all right; they won't know you;" then said Dawson, "I'll go over to see if the way is clear," and left, going across the street; in a short time he came back and said, "everything is all right; take him over and sign up the deed." Thereupon Cottrell and Pratt left for the notary's office, which was in the Sheidley building, an office building at southwest corner of Ninth and Main streets, diagonally across the street from the bucket-shop. The main and public entrance to this building was in front, fronting Main street, where the elevator was; there was also a side entrance on the corner of the alley and Ninth street, not nearly so public, where there was no elevator, but only a stairway to climb. At this side entrance on the alley and Ninth street, Crab, the defendant, by a prearranged agreement, was waiting for Pratt and Cottrell. Pratt's introduction of Cottrell to Crab was in these words: "This is the man that Dawson has got to play the part of Bishop for us." Cottrell said: "This is mighty ticklish business. How about the notary?" to which Crab, the defendant, reassuringly replied to Cottrell that "the notary is all right; we are acquainted with the notary, and we will introduce you as Bishop."

Pratt and Crabb then led the way from the side entrance, climbing the stairs to the office of the notary, an attorney named Thompson; Pratt, in Crab's presence, introduced Cottrell to the notary, Thompson, as Wayne S. Bishop; Cottrell signed Bishop's name to the deed conveying the Layfayette county farm, and acknowledged the instrument.

This deed, which was executed and delivered to the defendant, was mailed by him the next morning to the recorder of deeds of Lafayette county, at Lexing-

ton, accompanied by a letter, requesting that it be recorded at once and the original returned to him.

Dawson had, previously to the execution of the forged deed, been trying through Lesueur to effect a loan on the land in the event of his purchase. The latter, not suspecting anything wrong, corresponded with Dawson (as John K. Whalen) concerning the cost of an abstract and the amount of a loan, agreeing to loan several thousand dollars on the farm. A number of letters upon this contemplated loan passed between them. On the morning the forged Bishop deed, mailed by Crab to the recorder of deeds at Lexington, was received by the recorder, Lesueur happened to be in the recorder's office, and the original was shown to him. Although Bishop lived in another county, Lesueur had done business for him and was familiar with his handwriting; he became suspicious, communicated with Bishop, ascertained the deed was a forgery, and the matter was laid before prosecuting attorney Brown of Kansas City.

Upon the day the forged deed was mailed by Crab to the recorder at Lexington, Lesueur received a letter from Crab containing the correspondence which Dawson had been having (under the name of John K. Whalen) with Lesueur for negotiating a loan on the Bishop farm, and in his letter Crab referred to the former letters which had passed between Dawson (Whalen) and Lesueur, showed perfect familiarity with their every detail, adopted their propositions and continued their negotiations for abstract and loan, without any interruption, and just as if from the same person, except that a different name was signed to the letters than previously.

Lesueur, acting now under directions from prosecuting attorney Brown, kept up this correspondence with Crab concerning the desired loan, agreed to make

it, but raised a technical objection to the form of the Bishop deed to Crab, and suggested that it be corrected; this was done in order to compel the conspirators to again produce the person who had signed Bishop's name before a different notary public, E. G. Taylor, designated by Lesueur, for the ostensible purpose of executing a corrected deed, but really so that when so appearing he could be arrested.

Lesueur wrote to Crab about correcting the deed; Crab promised to bring Cottrell before Taylor to re-execute the deed. Dawson immediately hunts up Cottrell and tells him there is some mistake in the discription in the deed, and asks him to appear before Taylor to re-execute it. Cottrell refuses to appear before a strange and different notary; thereupon, Crab goes to Taylor and endeavors to obtain from him the correct deed left by Lesueur, in order to have it re-executed by Cottrell before Thompson, the former notary, and failing to obtain it from Taylor, writes to Lesueur asking what corrections he desires made.

Pratt and Crab were first arrested; about a week thereafter Cottrell was arrested and then Dawson. Immediately upon Cottrell's arrest he made a full confession. Crab got from Mr. Tobie a deed in blank for about three thousand acres of land in Johnson county, Kentucky, worth from six cents to $3 per acre, which was turned over to Cottrell as Bishop in part consideration for the Bishop land, but he knew at the time that Cottrell was not Bishop. The conspirators are of limited means, having no money or property.

The first contention on the part of the defendant is that the court committed error in permitting the Whalen letters to Lesueur to be read in evidence as against him. This contention is predicated upon the ground as contended that there was no evidence of any

knowledge on the part of the defendant of the existence of these letters prior to the commission of the act of forgery on June 9, 1893, or that he was in any way connected with the writing of said letters, or that there was any conspiracy shown to exist between the parties before that time, to effect any common design, and that a conspiracy must be first shown to have existed at the time of their writing.

It is very seldom that a conspiracy can be shown to exist by direct evidence, and must of necessity be shown by facts and circumstances. Nor is it necessary to prove an actual agreement to enter into a conspiracy, or to do any unlawful act. When the part that defendant played in this transaction, his acts and conduct, are taken into consideration, it is impossible to come to any other conclusion than that he was not only in the conspiracy with his co-conspirators, but that he took a very conspicuous part. He is found present at the time of the execution of the forged deed to himself; took possession of it soon thereafter and sent it by mail to the recorder's office for record; got a valuable farm worth $15,000 for his note without security for $2,050 payable in ninety days, and deed to three thousand acres of worthless Kentucky land. He is also found in possession of a portion of the Whalen, *alias* Dawson, correspondence with Lesueur, and delivers one of the letters from Lesueur to Whalen to the notary Thompson, directing him to draw a deed according to the description of the land contained therein, which acts and transactions do not seem to comport very well with the theory of innocence, to say nothing of many other cogent facts and circumstances in proof.

Here while the conspirators acted different parts, they all had the same object in view, the same common purpose to be accomplished, that is, to procure a forged deed for the Bishop farm to one of their number, and

then for the grantee named in such deed, to obtain a loan on the farm for a large sum of money, as appears from the Whalen letters and by defendant's letters written afterwards.

It was not at all necessary that defendant should have known anything about the writing of the Whalen letters at or before the time they were written in order that they might be read in evidence against him; or that the conspiracy originated with the defendant, but if he entered into a "common design already formed (he) is deemed in law a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design." 3 Greenleaf on Ev. [14 Ed.], sec. 93. "Everyone who enters into a common purpose or design is generally deemed, in law, a party to every act which had before been done by the others and a party to every act which may afterwards be done by any of the others in furtherance of such common design." 1 Greenleaf on Ev. [14 Ed.], sec. 111.

Moreover at the time the letters were read in evidence no objection was made and saved thereto, and the defendant can not now be heard to complain. *State v. Maloney*, 118 Mo. 112. What has been said applies alike to the evidence of Messrs. Lesueur, Seidlitz, and Vincil, with respect of the comparison of handwriting in the Whalen letters with a letter not introduced in evidence, which it was claimed was written by Dawson but not admitted nor introduced in evidence. No objection was made to its introduction. *State v. Foster*, 115 Mo. 448; *State v. DeMosse*, 98 Mo. 340; *State v. Elvins*, 101 Mo. 243; *State v. Maloney*, 118 Mo. 112.

Cottrell, who was one of defendant's co-indictees, was sworn as a witness and testified on the part of the state and against the defendant and, in permitting him

to testify, it is urged that the court committed error.
There was no objection made to his competency as a
witness and it could not be made for the first time in
a motion for a new trial. A party can not sit by and
permit a witness to testify, without objection, who is
incompetent, and for the first time raise the question
as to his incompetency in a motion for a new trial. If
he desires to avail himself of the objection he should
make it at the time the witness is introduced, otherwise
he will be deemed to have waived any objection to its
incompetency. 1 Rice on Ev., sec. 259; *Hickman v.
Green*, 122 Mo. ——; 27 S. W. Rep. 440; *People v.
Chacon*, 102 N. Y. 669; *Quin v. Loyd*, 41 N. Y. 349.

The record shows that the indictment was dis-
missed as to Cottrell on the day the trial of defendant
began, but does not show whether it was before or
after, and we can not presume that it was after. Even
if after, the objection as to his competency was waived
because not made in time.

The eighth instruction, given at the instance of
the state, is assailed upon the ground that it is mis-
leading. It is as follows:

"Although you believe that the act of signing the
name of Wayne S. Bishop to the deed in evidence with
the intent of forging said name to the deed was in fact
done by some person other than the defendant Jacob
H. Crab, yet if you shall further believe that the
defendant Crab was present at the time knowingly or
intentionally aiding, abetting, assisting, counseling
or advising in the doing of such an act, you must treat
such act as one done and performed by said Crab
himself."

This instruction, we think, contains a proper
exposition of the law. That the deed was a forgery
was an undisputed fact, and if the name of Bishop was
signed thereto by Cottrell with the intent of forging

said name, and defendant was present at the time, knowingly or intentionally aiding or assisting, he was clearly guilty, as much so as if he had forged Bishop's name himself. It is not enough under this instruction that Crab was present but it requires more, that is, that the name of Wayne S. Bishop was being signed to the deed with the *intent of forging said name* and that defendant was present at the time knowingly and intentionally aiding, abetting, assisting, counseling or advising the doing of such act. It seems difficult to perceive how the jury could have been misled by an instruction so comprehensive.

Complaint is also made of the state's ninth instruction, which is as follows:

"The court instructs the jury that the testimony of an accomplice in the crime, that is, the person who actually commits or participates in the crime is admissible. Yet evidence of an accomplice in crime, when not corroborated by some person or persons not implicated in the crime as to matters material to the issues, that is, matters connecting the defendant with the commission of the crime as charged against him, ought to be received with great caution by the jury, and the jury ought to be fully satisfied of its truth before they should convict the defendant on such testimony. The court further instructs the jury that you are at liberty to convict the defendant Jacob H. Crab on the uncorroborated testimony of an accomplice alone if you believe the statements as given by such accomplice in his testimony to be true; if you further believe that the state of facts sworn to by the witness, if any, will establish the guilt of said defendant."

This instruction is almost a literal copy of an instruction approved by this court in the case of *State v. Harkins*, 100 Mo. 666, and *State v. Jackson*, 106 Mo.

179, and places the law respecting the evidence of accomplices fairly before the jury.

The case was fairly submitted to the jury on the evidence; the evidence justified the verdict, and, finding no error in the record, the judgment of the criminal court is affirmed. All of this division concur.